**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:17CR138-PPS |
| | ) | |
| KEENAN SEYMOUR, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant Keenan Seymour is one of 19 defendants charged with conspiracy to participate in racketeering as members of the Latin Dragon Nation, a criminal street gang. Seymour is also charged with a drug distribution conspiracy. The indictment further alleges that Seymour, along with co-defendants Justin Anaya and Alec Aguilar, are responsible for the shooting death of Manuel Salazar. Seymour seeks the suppression of all the statements he made to Chicago police officers on December 1, 2017 in the course of the CPD's investigation of Salazar's death. Because Seymour was in custody when he made the pertinent statements, and he made the statements without the benefit of *Miranda* warnings,[1] the statements will be suppressed.

## Findings of Fact

The morning of November 24, 2017, the day after Thanksgiving, Manuel Salazar died from gunshot wounds inflicted while the Grand Prix in which he was riding with his girlfriend was under fire from another vehicle, an Oldsmobile Alero. The shooting

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

occurred on the southeast side of Chicago, and was investigated by the Chicago Police Department.  Salazar's girlfriend provided a description of the other vehicle to the CPD, which shared it with the Hammond, Indiana police department because street gangs were known to cross the state border between Chicago and Hammond.

CPD Detective Richard Hanrahan received a report from the Hammond Police Department that, on the day of the Salazar shooting, HPD had conducted a traffic stop of a car matching the Alero's description. The stop was based on the passengers in the Alero not wearing seatbelts.  HPD identified the occupants of the car during the traffic stop as Justin Anaya, Keenan Seymour, Deandre McGowan and Alec Aguilar, along with a female passenger. HPD bodycam footage showed the occupants' placement within the car at the time of the traffic stop.  Detective Hanrahan testified that Aguilar and Anaya were believed to be affiliated with the Latin Dragons gang, having switched from an earlier allegiance to the Latin Kings.  Keenan Seymour, then age 18, was believed to have been in the back seat of the car that fired shots on Salazar's car. Because Seymour was associating with Aguilar and Anaya, CPD suspected Seymour had become a Latin Dragon.

Within days of the murder, CPD officers visited the last known addresses of both Deandre McGowan and Keenan Seymour, but neither was found to be at home. McGowan later contacted detectives who had left word of their interest in speaking with him.  Detective Michael Cummings interviewed Deandre McGowan at Area South

police station on November 30.  That same day, Alec Aguilar was also arrested relating to the shooting death of Salazar.

McGowan told Cummings that he had been in the car with three Latin Dragons, and that they were in a rival gang neighborhood looking to shoot a rival gang member. McGowan said that he had been in the back seat, and identified the other occupants as Seymour in the back with him, Alec Aguilar as the driver, and Justin Anaya as the front passenger.  McGowan initially claimed that the driver (Aguilar) was the shooter, but several days later reported that the shooter had been Anaya, the front seat passenger. On November 30, an Assistant State's Attorney interviewed McGowan as part of the felony review process, by which the State's Attorney decides whether or not to charge a person with a felony.  McGowan was not arrested at that time, and was allowed to leave Area South. To my knowledge, McGowan has not been charged relating to the Salazar shooting.

The next day, on December 1, 2017, Detective Hanrahan received a phone call from an HPD officer reporting that Hammond had made another traffic stop earlier that day of a vehicle in which a Monica Dixon was the driver and Keenan Seymour was the passenger.  Based on the previous investigation, CPD was interested in interviewing Seymour about the Salazar murder.   HPD had shared that Dixon was driving without a driver's license, and that the car appeared to be heading back into Chicago where Dixon lived.  That evening, Officer Ricardo Gallegos and his partner were in an unmarked car working as part of a CPD tactical unit in southeast Chicago.  Det. Hanrahan contacted

3

Officer Gallegos and asked him to make a stop of Monica Dixon's car based on the report that she was driving without a license. Of course, the stop was a pretext. Hanrahan really wanted to talk with Seymour, her passenger, about the Salazar murder.

Using flashing lights on their patrol car, Officer Gallegos and his partner pulled Dixon's car over at approximately 7:00 pm in the block where she lived in southeast Chicago. Bodycam footage shows that Gallegos proceeded immediately to the passenger side of the car and instructed Seymour to step out of the car. Gallegos placed Seymour in handcuffs behind his back and asked Seymour to identify himself, which he did. Gallegos testified that he handcuffed Seymour for purposes of officer safety, given the gang conflicts going on in the area and not knowing whether Seymour had any weapons on him. Gallegos never displayed his weapon during his interaction with Seymour, never raised his voice and never asked Seymour any questions.

CPD Detective Michael Cummings was already on the scene with Detective Maloney, waiting to talk to Seymour. In response to Det. Cummings' question, Seymour again identified himself. Det. Cummings indicated that he wanted to talk to Seymour about "Alec" (a reference to Alec Aguilar) and "what had gone down at Thanksgiving." At Det. Cummings' direction, Seymour was moved across the street to where the detective's car was parked. Next to his car, Det. Cummings patted Seymour down and had him sit in the back seat of his car. Det. Cummings testified that Seymour

told him he didn't want to talk to the police outside his girlfriend's house, but in his testimony, Seymour denied this.

Det. Cummings then returned briefly to Dixon's car, where she confirmed that she had been stopped by the police in Hammond earlier and that she had no driver's license. Det. Cummings advised Dixon that she was pulled over because of the lack of a driver's license, but told her she was free to go after she pointed out that they were in front of her residence. Det. Cummings then advised Officer Gallegos and his partner that they were going around the corner. Both cars were moved to a nearby street. Officer Gallegos testified that police commonly make such a move for officer safety when they don't know who is around a scene and whether other gang members might be close by.

Additional bodycam footage was taken after Det. Cummings' car was driven around the block from the scene of the initial stop. All the occupants of the cars exited and stood next to the cars. Seymour was no longer in handcuffs, as Officer Gallegos had removed them when Seymour exited the car. Det. Cummings and Seymour are shown talking briefly but with no audio. Once the sound was turned on, Det. Cummings affirmed Seymour's name, that officers pulled over Dixon's car about a block away, and that Dixon had no driver's license. Seymour indicated that Dixon was given a warning and released. Det. Cummings then stated that he had told Seymour he wanted to talk to him about "that thing" that happened after Thanksgiving, that Seymour didn't want to talk around his people and "said to come over here."

On camera, Seymour agreed that he was willingly going with Det. Cummings to the Area South station to talk, and that he was not under arrest.  The time was approximately 7:15 p.m.  At no time during their encounter on the street did Det. Cummings tell Seymour that he was free to leave.  Det. Cummings testified that the interaction with Seymour that was video-recorded without audio was the same discussion that was then immediately repeated once the audio was turned on.  Because Det. Cummings had never worn a body camera, he said he was unfamiliar with them, suggesting he didn't realize it was not recording audio during the first exchange.

The tone of Det. Cummings' voice was firm and business like but conversational; it wasn't confrontational or aggressive throughout the encounter with Seymour on the street.  During their interaction, Seymour never indicated that he was unwilling to talk to Det. Cummings, that he wanted to go home, or ask to be let out of the car.  Det. Cummings testified that if Seymour made any statement along those lines, he would have been free to go because he was then considered to be a witness, not a suspect, and he was not under arrest.

The drive to Area South was no more than 15 minutes, and Seymour was not in handcuffs during the drive or at any subsequent time that night.  Det. Cummings testified that there was no substantive questioning during the car ride.  Seymour testified that he was asked about the murder, but repeatedly disclaimed any knowledge of it.  At the police station, Seymour was taken to an interview room, bare but for a table

6

and seats.  Seymour was left alone in the room for approximately 30 minutes.  The door to the room was closed and locked by Det. Cummings from the outside.

Det. Cummings returned, and Seymour was interviewed for the first time about the Salazar murder, and his involvement in it.  He was not read his *Miranda* rights. During this initial interview, lasting approximately 30 minutes, Seymour never indicated that he didn't want to talk or that he wanted to go home or that he wanted a lawyer, but neither was Seymour told his cooperation was voluntary, that he was free to leave, or that he could insist on an attorney before answering questions.  During the interview, Seymour confirmed that he was in the car with other Latin Dragons the night Salazar was killed.  They were in Latin King territory. Seymour told Det. Cummings that he and his companions pulled up on another car, and Alec Aguilar, who was driving, started throwing Latin Dragon gang signs toward the other car. A high speed chase ensued and eventually, Justin Anaya , who was in the front passenger seat, pulled out a gun and shot at the other car, killing Salazar in the process. Seymour told Det. Cummings he did not know that Anaya was planning to shoot anyone that night until after it happened. He claimed to believe that the group was going out that night looking for Latin Kings to beat up.

After this first interview, the police contacted the Cook County State's Attorney's Office, to request an Assistant State's Attorney to conduct a felony review interview of Seymour. Assistant States Attorney Jennifer Dillman arrived and conducted an interview of Seymour with Detective Cummings present, beginning at 9:25 p.m.  Once

again, Seymour was not read his *Miranda* rights or told that he was free to leave. During this second interview, in addition to what he had told Det. Cummings, Seymour acknowledged that he had known on November 24 that Justin Anaya had a gun and that the group's purpose was to look for and shoot at rival Latin Kings. Seymour again confirmed that the front seat passenger, Anaya, was the shooter. Seymour did not ask to stop speaking or answering questions, or ask for a lawyer. ASA Dillman stopped the interview at 9:55 pm. She told Det. Cummings that she believed that Seymour had implicated himself in the Salazar murder and should be treated as a suspect and not merely a witness. Det. Cummings testified that it was at this point that he considered Seymour to be under arrest, but neither Cummings nor anyone else bothered to tell Seymour this change in his status.

ASA Dillman testified to her belief that Det. Cummings' previous interviews of Seymour had not elicited the information that Dillman believed rose to the level of criminal culpability for Salazar's murder. That changed when Seymour admitted to his understanding of and agreement with the group's intent to locate and shoot a rival gang member and Seymour's *prior* knowledge that Anaya had a gun in the car. In other words, when he first talked with Det. Cummings, he admitted that Anaya pulled a gun but he also told the detectives that he wasn't aware of the gun until it was pulled out and actually used by Anaya. Up to that point, as he told Det. Cummings, he understood the group's intention that night was merely to "beat up a Latin King." [DE 567 at 8.] This crucial distinction — prior knowledge of the gun and the group's intent to shoot a

8

Latin King — led ASA Dillman to believe that Seymour should be treated as a suspect, not a witness any longer. Seymour wasn't told this change in his status. From his point of view, he was still sitting in a locked room at the police department both before and after he made the additional statement.

Because Illinois law requires the recording of suspect interviews relating to murder charges, Seymour was moved to another interview room with recording equipment. Detectives Cummings and Rodenberg entered this interview room at approximately 11:00 p.m. Cummings told Seymour that his partner was going to read Seymour his rights and then they would go over Seymour's statement. Rodenberg read each *Miranda* right and Seymour indicated he understood each one. Seymour was not asked if he waived each or any of the rights. He was not presented with any piece of paper listing the rights or asked to sign any paper signifying his waiver of the *Miranda* rights. Detective Cummings testified that this was done according to standard Chicago Police Department procedure. Cummings testified that the CPD does not use a *Miranda* waiver form and that, oddly, he has never seen one. In any event, even though Seymour's custody situation had changed (at least from law enforcement's point of view), Seymour was still not told he was under arrest, and he was not asked if he was willing to continue talking with the detectives.

After the *Miranda* rights were provided to Seymour, Det. Cummings started the third installment of the interview process by reviewing the circumstances of the stop of Dixon's car; that he had told Seymour he wasn't under arrest but wanted to talk to him

about what happened the day after Thanksgiving; and that they had come to the police station where Seymour talked to Cummings and to the State's Attorney. Cummings said he just wanted to go over Seymour's earlier statements that he had rehearsed twice before. Seymour talked and responded to questions posed by the two detectives. Seymour did not ask for a lawyer or ask to stop the interview. Cummings was confident that Seymour was not invoking any of his *Miranda* rights. The questioning was conducted in a relaxed manner, with Seymour and the detectives seated around a small table. This interview lasted approximately 35 minutes, ending around 11:35 pm. By this point in time, Seymour had been under the officers' control for more than four hours. At the conclusion of the last interview, Seymour appeared to realize for the first time that he was then under arrest, saying "I'm not going home, am I?"

Seymour testified repeatedly that he never felt free to go, that he cooperated throughout because there were always at least 3 or 4 police officers around, he was scared and felt he had no other option. Seymour testified that at Area South, he wasn't sure where he was, no family or friends knew his whereabouts and he was not allowed a phone call.

## Discussion

"[B]efore law enforcement officers can interrogate a suspect in custody, they must inform the suspect of his *Miranda* rights." *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018), citing *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009). A threshold question for Seymour's motion to suppress is therefore whether and when

Seymour was "in custody" for purposes of *Miranda*.  Seymour argues that he was "arrested without probable cause and taken into custody" on December 1, 2017 at the point when he was removed from Monica Dixon's car, citing the facts that he was immediately handcuffed, led to a police car, and shortly thereafter taken to the Area South police station.  [DE 546 at 9.] But this analysis is a little too facile. The Fourth Amendment requires a more nuanced examination of what occurred on the night of December 1.

To begin, CPD officers had at least reasonable suspicion (if not probable cause to believe) that Dixon was driving without a license, having been told as much by Hammond officers who had stopped her shortly before.  *United States v. Kahn*, 937 F.3d 1042, 1052-53 (7th Cir. 2019) ("The collective knowledge doctrine permits a stop at the direction of, or based on information relayed from, another law enforcement agency"). The traffic stop therefore did not violate the Fourth Amendment, even if the actual subjective purpose of the stop was to question Seymour.  The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved, and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *Whren v. United States*, 17 U.S. 806, 813 (1996).  *See also Tapley v. Chambers*, 840 F.3d 370, 377 (7th Cir. 2016).

The next issue is whether the initial detention of Seymour on the street, separate and apart from the stop of the car in which he was riding, was constitutionally permissible.  The Fourth Amendment permits officers to make a "limited intrusion into

11

an individual's privacy" when they can point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  This standard applies to law enforcement investigation of a completed felony, as well as an ongoing one.  *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice").

Here, the collective knowledge of the officers on the scene included that Seymour was then a passenger in Dixon's car and that he had been identified as a passenger in the car from which the shots were fired that killed Manuel Salazar a week earlier.  The latter information derived from statements previously made to the CPD by Aguilar and McGowan, the Hammond police officer bodycam footage that showed Seymour in the Alero later on the day of the shooting, as well as Seymour's gang affiliation and the statement of Salazar's girlfriend that the shooting incident involved the flashing of gang signs.  Taken together, these fruits of the earlier investigation supported reasonable suspicion of Seymour's participation in illegal activity, and justified a *Terry* stop once Seymour was located.

I next consider the constitutionality of Seymour being handcuffed immediately upon his exit from Dixon's car.  I have found that Seymour was handcuffed only for a

matter of minutes until he was driven around the corner and got out of Detective

Cummings' car, and not again thereafter as he was driven to the police station or while

questioned over the ensuing hours.  A person is "in custody" for *Miranda* purposes if

his freedom of movement is restrained to the degree associated with a formal arrest.

*United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016).  An objective test applies,

namely whether a reasonable person under the same circumstances would have felt free

to leave.  *Id.*  Factors to be considered include:

> whether the encounter occurred in a public place, whether the suspect
> consented to speak with the officers; whether the officers informed the
> individual that he was not under arrest and was free to leave; whether the
> individual was moved to another area; whether there was a threatening
> presence of several officers and a display of weapons or physical force;
> and whether the officers' tone of voice was such that their requests were
> likely to be obeyed.

*United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011), citing *United States v.*

*Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011).

Being handcuffed is a level of restraint on freedom of movement associated with

a formal arrest.  During that brief time frame, Seymour was likely in custody.  But the

decision to handcuff Seymour was reasonably made in the interest of officer safety,

given the gang violence in the area, the suspicion of Seymour's involvement in recent

gang violence, and concern that Seymour might have a weapon.  It seems clear under

the circumstances that handcuffing Seymour was done in response to "justifiable fear

for personal safety on the part of the officer(s)."  *United States v. Bullock*, 632 F.3d 1004,

1016 (7th Cir. 2011). I need not make a definitive ruling about whether Seymour was in

fact in custody during this limited period of time because, once Seymour was patted down and moved to a less volatile environment close by, the cuffs were removed. And, more to the point, the record reflects that during those relatively few minutes Seymour was in handcuffs, he made no statements that the government seeks to use or that Seymour moves to exclude. The fact that he was handcuffed may however be relevant when considering the totality of the circumstances of what took place later.

After the handcuffs were removed, Seymour was told that he was not under arrest, but he was never told that he was free to leave. Seymour never indicated an unwillingness to talk, but, on the other hand, he was never told he could refuse to answer questions. Other considerations also weigh on both sides of the custody analysis. Although Seymour was recorded expressing his agreement to voluntarily accompany Detective Cummings to Area South to be interviewed about the Salazar shooting, Seymour testified that in the seconds before the audio recording began, Cummings told Seymour what he was expected to say. The encounter occurred in a public place on a city street, but Seymour had by now been separated from his girlfriend who had left the scene, and two detectives and two patrol officers were present.

The video reflects that the tone of the conversation between Detective Cummings and Seymour was conversational and indicated no intimidation or coercion, but Seymour would have been aware that the true purpose of the police in stopping Dixon's car was to question Seymour about the Salazar murder, a serious crime likely to suggest

14

to Seymour that the police questioning was not casual.  Seymour was only 18 years old, but had previous experience with law enforcement, and had only two months before been advised of his *Miranda* rights and opted to waive them and give a statement.  In sum, the circumstances of Seymour's encounter with the police up to this point create a draw as to whether a reasonable person in Seymour's shoes would have felt free to leave. But again, it's neither here nor there because no particular statements made by Seymour during the conversation on the street or in the car en route to the station appear to be at issue.

The analysis so far gets us to the police station. Once Seymour was brought into the police station, the first round of questioning commenced. This is the point at which the circumstances begin to strongly support the conclusion that a person in Seymour's circumstances would not have believed himself free to leave.  Seymour was placed in an interview room, where he was left alone for approximately 30 minutes.  Seymour was not told that he was free to leave.  The door was closed, and Cummings locked Seymour in.  The first interview at Area South with Detective Cummings lasted approximately 30 minutes, somewhere between 7:30 and 9:00 p.m.

During this session Cummings determined that an Assistant State's Attorney should be called in to interview Seymour.  Cummings again left Seymour in the locked room, telling him that he needed to remain in the room and would be talking more about the murder with a prosecutor.  Cummings did not advise Seymour that he was free to leave.  The next interview was conducted by Assistant State's Attorney Dillman

15

and Detective Cummings.  It lasted approximately 30 minutes, to roughly 10:00 p.m. This questioning took place in the same locked room.

Because Dillman believed Seymour's answers incriminated him in Salazar's murder, she determined that Illinois law required any further questioning to be videotaped.  Seymour was moved to a room outfitted with the necessary recording equipment and left to wait another 30 minutes before the third installment of the interview could take place. It was prior to this third interview that Seymour was finally given *Miranda* warnings.  The police believed that Seymour was in custody as of this point in the evening's events, but what the police thought is beside the point.  *Stansbury v. California*, 511 U.S. 318, 323 (1994) (the subjective beliefs of the suspect and police officers are irrelevant on the question of custody for *Miranda* purposes).  Recall that the standard is an objective one: what would a reasonable person in Seymour's shoes have thought. No one informed Seymour that his position had changed and that he was in fact now under arrest. So he had no reason to believe that his degree of liberty was any different than it had been during the two previous interviews that evening at Area South.

Seymour's treatment at the station was such that his freedom of movement was restrained to the degree associated with a formal arrest.  *Patterson*, 826 F.3d at 455. He was kept in locked rooms for approximately 4 hours, he was never told he was free to leave, and no circumstances distinguished the two sessions of questioning that preceded the third round when he was indisputably in custody. In addition, a

16

reasonable person placed in these circumstances would also take into account *how* he

arrived at the police station: after being pulled over with lights and sirens, ordered out

of the car, handcuffed (albeit for a short period of time), and moved to another location.

In considering the totality of the circumstances under an objective standard, I find that a

reasonable person in Seymour's shoes would not have felt that he was free to terminate

the questioning and leave the police station that night.

The facts here are distinguishable from those in *United States v. Ruiz*, 785 F.3d

1134, 1145 (7th Cir. 2015), in which the Seventh Circuit concluded that the defendant was

not in custody.  The officers did not tell Ruiz that he was not under arrest or that he was

free to leave, but Ruiz agreed to relocate the police encounter to the police station from

a residential area where he was first approached by the police.  Critically different from

our case are the facts that Ruiz drove himself to the station, where Ruiz retained his

driver's license and phones, and that the further conversation occurred beside Ruiz's

car in police station's public parking lot.

I also find *United States v. Littledale*, 652 F.3d 698 (7th Cir. 2011) distinguishable.

Littledale was not in custody where he "twice consented to be interviewed, there was

no display of force or physical touching, the officers and agents used a monotone tone

of voice, and even though the agents did not tell Littledale that he was free to leave,

they did assure him that he was not under arrest."  *Id*. at 702. The fact that "the

interview took place in the campus police station" was "not dispositive." *Id*., citing

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1997) (stating that *Miranda* rights are not required

17

"simply because the questioning takes place in the police station house").  But agreeing to a short walk with officers within a college campus to a campus police station is less suggestive of custody than being taken to the station in a police car from a scene where lights, sirens and handcuffs were used. Furthermore, in significant contrast to this case, Littledale's interview was conducted in a private office containing "a desk, a computer, and other personal items," not an interrogation room or an interview room like the bare locked room Seymour was kept in for several hours.  *Littledale*, 652 F.3d at 700.

The Government argues that Seymour was not in custody until he was about to make his third statement . But from Seymour's point of view, nothing had changed. To repeat, perhaps the officers believed that he was then in custody, but what they thought doesn't matter.  Considering all the circumstances of Seymour's encounter with Chicago police that night, I conclude that by the time Seymour was placed in the locked room at Area South and questioned for the first of three times there, the environment would have caused a reasonable person to believe that he was not "at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Because Seymour was in custody but had not waived his rights under *Miranda*, his unwarned statements during his first interview with Detective Cummings and his second interview with ASA Dillman must be suppressed.

The next issue is what to make of the third statement given by Seymour — the one he made after his *Miranda* rights had been read to him.   In attacking this question, I must consider the application of the Supreme Court's decision in *Missouri v. Seibert*, 542

18

U.S. 600 (2004). *Seibert* addressed "the admissibility of a confession obtained by a two-step interrogation process in which *Miranda* warnings were delivered mid-interrogation, after an initial and unwarned inculpatory statement by the suspect." *United States v. Stewart* ("*Stewart II*"), 536 F.3d 714, 718 (7th Cir. 2008). Seymour invokes *Seibert* in support of his motion to suppress all statements he made even after being advised of his rights under *Miranda*. [DE 546 at 12.]

*Seibert* was decided by a plurality opinion, and the breadth of the holding is therefore limited by consideration of the concurring opinions of Justices Breyer and Kennedy. The result is different paths of analysis depending on whether the use of the two-step interrogation is found to have been deliberately employed to withhold *Miranda* warnings until after the agents have obtained an inculpatory statement. *Stewart II*, 536 F.3d at 718-19. Construing *Seibert*, the Seventh Circuit has held that in the event of a "*deliberate* two-step interrogation[] in which *Miranda* warnings are intentionally withheld until after the suspect confesses," a "presumptive rule of exclusion" applies. *United States v. Stewart* ("*Stewart I*"), 388 F.3d 1079, 1090 (7th Cir. 2004).

The determination as to deliberate use of the two-step technique is "a factual inquiry" subject to a preponderance standard: "the government bears the burden of proving the police did *not* deliberately withhold the warnings until after they had an initial inculpatory statement in hand." *Stewart II*, 536 F.3d. at 719. *See also United States v. Magallon*, ___ F.3d ___, 2021 WL 68067, at *13 (8th Cir. Jan. 8, 2021) ("When a defendant

alleges his post-*Miranda* statement was obtained by a two-part interrogation, the

prosecution must establish by a preponderance of the evidence that the failure to give

*Miranda* warnings at the outset was not deliberate.")

Here the government has not expressly addressed *Seibert* or the issues it raises,

either in its brief [DE 567] or at the suppression hearing [DE 749].  This is despite the

fact that Seymour specifically raised the issue in his briefing. [DE 546 at 12-13.] Perhaps

this is because the government chose to put all its eggs in the "custody" basket.  In any

event, the government has not contended that the multi-stage interviews were not

deliberately designed to compromise the impact of *Miranda* warnings.  And the

evidence at the hearing does not support a finding that the police and Assistant State's

Attorney did not purposely conduct Interviews #1 and #2 without *Miranda* warnings in

order to obtain incriminating answers from Seymour before advising him of his *Miranda*

rights.  By failing to address the issue, despite it having been raised by Seymour in his

opening brief, the issue is now waived. *See,* e.g., United *States v. Stanbridge*, 813 F.3d

1032, 1038 (7th Cir. 2016) (the government forfeits an argument against suppression by

failing to make it in the district court); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir.

2002) (it is not the court's job to formulate arguments for the parties).  I cannot find that

the government has met its burden on this critical point when it has not even addressed

it.

As a result, the suppression analysis requires, under the plurality opinion in

*Seibert*, consideration of "whether it would be reasonable to find that in these

circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*,

542 U.S. at 611. In other words, because the government has not overcome the

presumption that the multi-stage interrogation process was deliberate, even the

"warned" statements are subject to suppression unless I determine that the warnings

ultimately given reasonably conveyed the rights *Miranda* is designed to protect. The

*Seibert* plurality asked:

> Could the warnings effectively advise the suspect that he had a real choice
> about giving an admissible statement at that juncture? Could they
> reasonably convey that he could choose to stop talking even if he had
> talked earlier? For unless the warnings could place a suspect who has just
> been interrogated in a position to make such an informed choice, there is
> no practical justification for accepting the formal warnings as compliance
> with *Miranda*, or for treating the second stage of interrogation as distinct
> from the first, unwarned and inadmissible segment.

*Id*. at 611-12. Circumstances relevant to the determination whether belated *Miranda*

warnings could be effective include "the completeness and detail of the questions and

answers in the first round of interrogation, the overlapping content of the two

statements, the timing and setting of the first and second, the continuity of police

personnel, and the degree to which the interrogator's questions treated the second

round as continuous with the first." *Id*. at 615.

Each of these factors weighs against the sufficiency of the *Miranda* warnings

belatedly given to Seymour. All three rounds of station house interrogation covered the

same ground, namely details of the Salazar shooting and Seymour's (and his fellows')

involvement in the shooting. Detective Cummings was a continuous presence in all

21

three interrogations, which were conducted *ad seriatim* over the course of four hours in the same location.  The three sessions were treated as continuous, with Seymour being told in each subsequent session that they would be "going over" the statements that he had already made.

In *Seibert*, the "unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill.  When the police were finished there was little, if anything, of incriminating potential left unsaid."  *Id*. at 616.  As here, the final round of interrogation occurred in the same place and involved the same officers as earlier questioning.  Although *Miranda* warnings were given, nothing was said "to counter the probable misimpression that the advice that anything [defendant] said could be used against [him] also applied to the details of the inculpatory statement previously elicited," and Seymour was not advised that his previous statements could not be used.  *Id*.  Also, the reasonable understanding that the final session was merely a continuation of the earlier one would likely make it appear "unnatural to refuse to repeat at the second stage what had been said before."  *Id*. at 617.

All of these factors, present in *Seibert* and in Seymour's interrogation in this case, result in the conclusion that "a reasonable person in the suspect's shoes would not have understood [the belated *Miranda* warnings] to convey a message that [he] retained a choice about continuing to talk."  *Id*.  Because adequate "curative measures" were not

taken, Seymour's post-*Miranda* statements must be suppressed along with his pre-*Miranda* ones.

ACCORDINGLY:

Defendant Keenan Seymour's Motion to Suppress [DE 546] is GRANTED, and Seymour's statements to Chicago police and the Assistant State's Attorney on the night of his arrest are SUPPRESSED.

SO ORDERED.

ENTERED:  February 4, 2021.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT