UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 2:17CR138-PPS |
| ) | |
| KEENAN SEYMOUR, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Keenan Seymour is one of 19 defendants in this conspiracy case arising from the conduct of the Latin Dragons street gang. Seymour entered a plea of guilty to a charge of conspiracy to engage in racketeering activity in violation of 18 U.S.C. §1962(d). A critical disputed issue relevant to Seymour's sentence is his culpability for the murder of Manuel Salazar, who was shot and killed by a fellow Dragon from the passenger seat of a car in which Seymour (then age 18) was one of four occupants. The impact of the determination is sizeable. The base offense level for racketeering under the U.S. Sentencing Guidelines is 19 or the level applicable to the underlying racketeering activity. U.S.S.G. §2E1.1(a). If Seymour is accountable for Salazar's murder, his base offense level rockets up to a 43 and he faces the recommended life sentence that goes along with it. U.S.S.G. §2A1.1(a). (However, Seymour's case is capped by the statutory maximum of twenty years). At a hearing on December 16, 2022, the parties presented evidence and argument on the issue. Here are my findings and conclusions on the matter.

## Findings of Fact

The Latin Dragon Nation street gang operated in southeast Chicago and northwest Indiana. Seymour admits having been part of the conspiracy of Latin Dragon members, and having engaged in acts of physical intimidation and violence with them, and committing robberies with them. Seymour well knew that the gang used particular colors, symbols, rules and a hierarchy. He also knew that the Latin Dragons often shot at persons suspected or known to be members of rival gangs, with the intent of killing them, particularly as acts of retaliation for violence toward any Latin Dragon believed to have been the work of a rival gang.

Seymour had known co-defendant Alec Aguilar from the neighborhood since 7th or 8th Grade. The two of them, along with co-defendant Justin Anaya and his brother Anthony Anaya, had been part of a group that called themselves the Reckless Boyz since approximately 2012. The Reckless Boyz would steal from retail stores, smoke weed, drink alcohol and get into fistfights. Later Alec Aguilar and defendant Seymour joined the Latin Kings, and their lawless behavior then involved carrying firearms. A January 2015 Facebook post by Seymour contains a photo of him with a gun he sometimes carried while he was a Latin King. Seymour is shown in another video brandishing both a rifle and a handgun. The Anaya brothers had become members of the Latin Dragons gang. In 2016, Alec Aguilar and Seymour shifted from the Latin Kings to the Latin Dragons, whose rivals included the Latin Kings, the Vice Lords, and the Spanish Vice Lords. They understood that they were expected to shoot at or beat up

2

members of rival gangs when they encountered them. When a Dragon was in a car with others, even if he had no weapon he was expected to be on the lookout for rivals and to keep watch for law enforcement.

The year 2017 was a violent one for the Latin Dragons. In May of 2017, co-defendant Ralph Mendez, Jr. shot and killed a prominent Latin King named Jose Gomez. Justin Anaya's older brother Anthony Anaya was killed on June 2, in what was believed to be an act of retaliation by the Latin Kings for the Gomez murder. Defendant Seymour was a close friend of Anthony Anaya's and posted tributes to him online after his death. Seymour engaged in online exchanges referencing payback to the Latin Kings for disrespecting Anthony's memory. Justin was very angry after his brother's death, and looked to retaliate. On July 14, Alec Aguilar and Justin Anaya shot and killed Gustavo Garcia, and the same day fellow Dragon Ralph Mendez, Jr. shot and killed Mike Whitford. On September 30, Latin Dragons also shot and killed Charles Berrios. Although the government offered no evidence of Seymour's involvement in any of these shootings, the evidence included demonstrations of Seymour's awareness of inter-gang violence, such as his use of the vernacular "kk" in texts as a reference to being a "King Killer" as a sign of disrespect to the rival Latin Kings.

The evening of November 23, 2017, which was Thanksgiving, Seymour spent time riding around with Justin Anaya and DeAndre McGowan in a car driven by Alec Aguilar. They were drinking alcohol, smoking marijuana and taking Xanax. They spent some time trying to steal from parked cars. In video clips taken by one of them,

3

Seymour and several others "drop gang signs" as a sign of disrespect to the Latin Kings. As the sun was coming up on November 24, Justin Anaya expressed the idea to pick up a gun and go looking for some Latin Kings. No one objected as Aguilar drove to Justin Anaya's house, where Anaya went briefly inside and returned with a gun. There was conflicting evidence about Anaya's precise words and actions concerning the gun, but I am persuaded by a preponderance of the evidence that all of the car's occupants, including defendant Seymour, were aware that Anaya had brought a gun into the car and proposed that they set out to find some Latin Kings to shoot at. During a discussion of where best to find Latin Kings, Seymour offered a suggestion about a street that might be fruitful. There was talk in the car about both looking for Latin Kings and keeping an eye out for the police. No one voiced any opposition or asked to be dropped off.

On November 24, 2017 at about 10:00 a.m., Manuel Salazar was the front seat passenger in a blue Pontiac Grand Prix being driven by his girlfriend Nancy Rodriguez in southeast Chicago. The Grand Prix was at a stoplight when the gray or beige Alero driven by Alec Aguilar pulled up beside it. Seymour, Anaya and Aguilar began flashing gang signs at Salazar and Rodriguez because they thought the Grand Prix belonged to a particular Latin King. Rodriguez called 911 to report that the Alero was following their car and that after making the gang signs one occupant of the Alero had displayed a gun. Justin Anaya put a mask on, hung out the window of the Alero and fired shots at the back of the Grand Prix. Salazar was shot in the back, the bullet having

4

traveled through the trunk and both the rear and front seats of the car. Co-defendant Justin Anaya has admitted, in connection with his guilty plea, that he fired the shot that killed Salazar. Ms. Rodriguez lost control of the Grand Prix, which then crashed into another car and came to a stop. The Alero drove away. DeAndre McGowan recalls Seymour laughing and "shaking up" with Alec in apparent celebration of the shooting.

After Justin Anaya dropped the gun off at his home, the group drove to a cemetery to visit the grave of Anthony Anaya, for whose death the Salazar shooting had been intended as retaliation. Roughly 2½ hours after the shooting, the Alero was stopped by a Hammond, Indiana police officer for an illegal turn and seat belt violations. The traffic stop occurred near the intersection of Hohman Avenue and Chicago Street in Hammond, only a few miles from the Salazar shooting. At that time, Alec Aguilar was still driving the car, with Justin Anaya in the front seat. In the back seat were defendant Seymour, DeAndre McGowan and a young woman named Mariah Tobicoe whom they had picked up en route to the cemetery. No reference was made to the Salazar shooting during the exchanges between the Hammond officer and the occupants of the car at that time.

On December 1, Seymour was questioned by Chicago police about the Salazar shooting. Seymour admitted that he knew Justin Anaya had a gun in the car, and that Justin had his gun out and was ready as they drove around looking for Kings to beat or shoot. He also indicated that although at one point he thought about asking to be dropped off, he didn't do so and ultimately decided just to go along with what was

happening. Seymour and the other occupants of the car believed there was a Latin King in the Grand Prix. Seymour acknowledged that the shooting was consistent with the code of the gangbanging life, in which gang members live by the sword and die by the sword. For sentencing purposes, Seymour's claims that he was ignorant about Justin Anaya's intentions the morning of the shooting are unpersuasive, as is his effort to admit only a willingness to beat up a suspected Latin King but to deny having any expectation about a possible shooting.

## Applicable Legal Principles

Under the Sentencing Guideline's principles of relevant conduct a defendant is accountable for the acts of others at sentencing, if the conduct is "(i) within the scope of ... (ii) in furtherance of ..., and (iii) reasonably foreseeable in connection with ..." jointly undertaken criminal activity. U.S.S.G. §1B1.3(a)(1)(B) & cmt. 3(A). The Seventh Circuit has said that this Guidelines standard is narrower than the *Pinkerton* standard for co-conspirator liability. *See United States v. Soto–Piedra*, 525 F.3d 527, 531 (7th Cir.2008) ("Conspiracy liability, as defined in *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946), is generally much broader than jointly undertaken criminal activity under §1B1.3."). The standard of §1B1.3 requires that the actions of the other person must have been both in furtherance of the jointly undertaken criminal activity and also reasonably foreseeable to the defendant. *United States v. Morales*, 655 F.3d 608, 635-36 (7th Cir. 2011). This determination requires the district court to "make a preliminary

6

determination of the scope of the criminal activity the defendant agreed to jointly undertake." *United States v. Salem*, 597 F.3d at 877, 886 (7th Cir. 2010).

There is a second (and more direct way) to potentially hold Seymour responsible under the Sentencing Guidelines for the murder of Mr. Salazar: if Seymour knowingly and intentionally aided and abetted his co-defendant's murder of Mr. Salazar, Seymour would be directly responsible for that crime. For purposes of sentencing, this is captured in the first definition of relevant conduct found in §1B1.3(a)(1)(A), a defendant is responsible "for all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant." So if Seymour aided and abetted the murder of Mr. Salazar, then he is directly responsible for it, and the case is governed by the first degree murder guidelines. *See* U.S.S.G. §2E1.1(a)(2) and §2A1.1.

The murder in question occurred in Illinois, and a third possible analysis could be undertaken applying Illinois law to the "underlying racketeering activity," as referred to in the racketeering guideline §2E1.1(a)(2). This may be the source, in the Addendum to the Presentence Report, of both parties' citation to the same Illinois authority on criminal accountability for the actions of others, 720 ILCS 5/5-2(c), which provides that a person is legally responsible for the conduct of another person when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." [DE 1102 at 3, 4.]

**Discussion**

I have identified three different possible analyses of whether Seymour should be sentenced as responsible for the Salazar shooting:  as relevant conduct under U.S.S.G. §1B1.3(a)(1)(A) because Seymour aided and abetted the shooting; as relevant conduct under U.S.S.G. §1B1.3(a)(1)(B) in a case of jointly undertaken criminal activity; and because Seymour is responsible for the shooting under Illinois law as the underlying racketeering activity referred to in §2E1.1(a)(2).  I find that all three analyses get me to the same conclusion: that the guidelines would apply the base offense level for murder in Seymour's case.  Application Note 2 to the relevant conduct guideline §1B1.3 instructs that "it is not necessary to review alternative provisions under which such accountability might be established," but given the severity of the impact on Seymour, I will offer a three-fold explanation anyway.

In the sentencing context, the Seventh Circuit has affirmed attributing murder to defendants in leadership positions of street gangs without proof of their physical participation. *See United States v. Porraz*, 943 F.3d 1099, 1102-04 (7th Cir. 2019); *United States v. Garcia*, 754 F.3d 460, 484-85 (7th Cir. 2014). As explained in *Porraz*, "we have held that the overt acts *personally committed* by a defendant do not establish the most serious underlying racketeering activity attributable to him." 943 F.3d at 1103 (emphasis in original). And where "the Latin Kings' constitution and the rules of [the] chapter expressly contemplated violence, including homicide, and [a defendant's] duties as an Inca included protecting the chapter's territory with violence, if necessary ..., [i]t [did]

8

not matter that there was no evidence that [defendant] pulled a trigger." *Id.* (citing *Garcia*, 754 F.3d at 485). Similarly in *United States v. Hernandez*, 37 F.4th 1316 (7th Cir. 2022), the Seventh Circuit found "ample grounds to conclude that Hernandez should be held accountable for conspiracy to commit murder." Hernandez had failed to dispute these supporting facts in the presentence investigation report: (1) he was an Inca responsible for implementing the gang's violent policies including shooting rival gang members on sight (which he'd ordered subordinates to do), and (2) he had himself shot at members of rival gangs and offered an AR-15 to other gang members for such purposes.

In *United States v. Garcia*, 754 F.3d 460 (7th Cir. 2014), another case involving a street gang racketeering conspiracy, the Seventh Circuit considered the sufficiency of the evidence supporting a cross-reference to §2A1.5 for conspiracy to commit murder. Luis Garcia argued that he had admitted only to drug dealing for purposes of his guilty plea, and had not "directly participated in acts of murder or violence" nor "could foresee that other Latin Kings would do such things." Id. at 484. The Court of Appeals held that "[t]o be accountable for the conduct of others at sentencing, 'that conduct must have been both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.'" *Id.*, quoting *United States v. Edwards*, 115 F.3d 1322, 1327 (7th Cir. 1997) (citing U.S.S.G. §1B1.3 n.2). In Luis's case, that test was met because the evidence showed that violence like the murder in question was contemplated by the gang's rules and Luis's role as an Inca included

9

"protecting his territory" in the manner that occurred. *Garcia*, 754 F.3d at 485. So "[i]t does not matter that there was no evidence that he pulled a trigger." *Id*.

There is no suggestion in the evidence that Seymour was anything more than a rank-and-file member of the Latin Dragons, so I have looked for decisions assessing responsibility for gang homicides in more analogous circumstances. In *Garcia*, another defendant named Ramirez argued on appeal that he should not be liable for the murder committed by co-conspirators. Again the Seventh Circuit rejected the argument, finding no error in the determination by a preponderance of the evidence "that the homicide was foreseeable to Ramirez, that it was done to further the conspiracy's goals, and that it could be attributed to Ramirez under *Pinkerton*." *Id*. at 488. The court cited these previous cases: *United States v. Morales*, 655 F.3d 608, 638 (7th Cir. 2011) (attributing co-conspirators' violent acts to defendants at sentencing under similar circumstances), and *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003), which the *Garcia* court summarized this way: "even if defendant was a fringe member of the conspiracy, so long as he joined it and the violent acts were reasonably foreseeable to him, murder committed by a co-conspirator could be attributed to him."

I am more than convinced that the shooting of Manuel Salazar was relevant conduct attributable to Keenan Seymour for sentencing purposes under the jointly undertaken criminal activity definition in §1B1.3(a)(1)(B). Justin Anaya's conduct in shooting Salazar was reasonably foreseeable to Seymour in connection with and in furtherance of their shared membership in the Latin Dragons conspiracy, the rules of

10

which included unleashing such violence on those perceived to be members of rival gangs. Seymour knew of and bought into the "street life" credo requiring the use of both fists and firearms against other gangs. More specifically, concerning this particular shooting, Seymour was aware that Justin had brought a gun into the car and that the group was driving around with the intent to locate some Latin Kings to shoot on the morning of November 24, 2017. What's more, Seymour's own conduct supports the conclusion that the shooting of Salazar was within the scope of the criminal activity Seymour agreed to jointly undertake. Seymour supported the plan by remaining with the group after becoming aware of Justin Anaya's intentions, by suggesting a neighborhood where Latin Kings could likely be found, and by riding in the car during the hunt to serve as a lookout for any Kings or law enforcement.

For all these reasons, the murder of Salazar was within the scope and in furtherance of criminal activity that Seymour agreed to jointly undertake and was reasonably foreseeable to Seymour. The murder is therefore relevant conduct under U.S.S.G. §1B1.3(a)(1)(B) and supports the use of the murder base offense level under the cross-reference required by U.S.S.G. §2E1.1(a)(2).

As suggested above, setting aside whether Seymour is responsible for the Salazar murder as relevant conduct arising from jointly undertaken criminal activity under §1B1.3(a)(1)(B), there is another way in which Seymour is also responsible for the murder. The facts also support application of the alternative definition of relevant conduct found in §1B1.3(a)(1)(A), which encompasses "all acts and omissions

11

committed, aided, abetted, counseled, commanded, induced procured, or willfully caused by the defendant" that were part of the same course of conduct or common scheme or plan as the offense of conviction. *United States v. Campbell*, 37 F.4th 1345, 1349–50 (7th Cir. 2022); *United States v. Tankson*, 836 F.3d 873, 883 (7th Cir. 2016), quoting § 1B1.3(a)(1)(A) and (a)(2). Interpreting the reference to aiding and abetting in 18 U.S.C. §2, the Supreme Court has held that "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994), quoted recently in *United States v. Rosemond*, 572 U.S. 65, 71 (2014).

Spelling out the definition, the Court held that "[a]s at common law, a person is liable under §2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond*, 572 U.S. at 71. The liability includes a person's minimal involvement and does not require participation in every element of the offense but only the aiding in any act necessary to constitute the offense. *Id.* at 73. "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence,' — even if that aid relates to only one (or some) of a crime's phases or elements." *Id.*, quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). The intent requirement is satisfied when a person "actively

12

participates in a criminal scheme knowing its extent and character." *Rosemond*, 572 U.S. at 77.

The definition is met here. Seymour chose to participate in the hunt for Latin Kings, knowing that Anaya had a firearm with the intention to shoot. Seymour offered assistance by suggesting where Latin Kings might be found, and by riding in the car where he could help spot potential victims and warn of law enforcement or other hazards to the plan. On these facts, Seymour knowingly elected to aid in the commission of the shooting. As the Supreme Court said in *Rosemond*, "[t]he law does not, nor should it, care whether he participate[d] with a happy heart or a sense of foreboding," or "whether he was formerly indifferent or even resistant to using firearms." *Id.*, 572 U.S. at 79-80. Seymour's intent can be reasonably inferred from "his continued participation in the crime during and after the shooting," and I would add "before" as well. *United States v. Burnett*, 37 F.4th 1235, 1240 (7th Cir. 2022). Although Seymour did not himself possess a gun, he cannot "hedge his bets, joining in a dangerous criminal scheme but evading its penalties by leaving use of the gun to someone else." *Rosemond*, 572 U.S. at 80. He "knew the heightened stakes when he decided to stay in the game." *Id*.

Finally, the evidence presented at the hearing makes clear that Seymour is criminally accountable under Illinois law as one who aided and abetted the murder of Salazar, and he is therefore accountable for the murder as the "underlying racketeering activity" that determines the base offense level under §2E1.1(a)(2). Under Illinois law,

13

Seymour is accountable as a principal for the murder if either before or during the act, he aided, abetted, agreed, or attempted to aid Anaya in the planning or commission of the offense. 720 ILCS 5/5-2(c). The Illinois definition also requires an "intent to promote or facilitate" the crime. Illinois cases discuss the two ways the government can prove a defendant's intent "to promote or facilitate" a crime, namely either that he shared the criminal intent of the principal (referred to as "shared-intent"), or that there was a common criminal design ("common-design"). *See, e.g., People v. Baker*, 2022 IL App (4th) 210713, ¶38, __ N.E.3d __ (Ill.App. Oct. 17, 2022).

    The latter is more applicable to this case, given that Seymour and Anaya didn't have a shared specific intent to murder Manuel Salazar in particular. "[I]n a common-design case, 'the State need not prove that the defendant and the principal shared the same intent vis-à-via the charged crime.'.... Instead,*** the State need only prove the accused had the specific intent to promote or facilitate *a* crime.' " *Id.*, quoting *People v. Phillips*, 2014 IL App (4th) 120695, ¶43, 14 N.E.3d 1, 8 (Ill.App. 2014). In the common-design context, "if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts...Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his

conviction of an offense committed by another." *People v. Fernandez*, 2014 IL 115527, ¶13, 6 N.E.3d 145, 149-50 (Ill. 2014).

In another recent unpublished decision, the Illinois Appellate Court applied the common design theory to find a defendant accountable for second degree murder in relation to two shooting deaths. *People v. Thompson*, 2022 IL App (1st) 210351-U, ___ N.E.3d ___ (Ill.App. Oct. 13, 2022). The court noted that "'[w]ords of agreement are not required to prove a common design or purpose'," which "'may be inferred from the circumstances surrounding the crime.'" *Id*. at ¶42, quoting *People v. Willis*, 2013 IL App (1st) 110233, ¶79, 997 N.E.2d 947, 966 (Ill.App. 2013). Circumstances that may be probative include: "the defendant's (1) presence at the scene without disapproval, (2) flight from the scene, (3) failure to report the crime, (4) close affiliation with the co-offender afterward, and (6) destroying or disposing of evidence." *Thompson*, ¶42. Citing the Illinois Supreme Court's decision in *Fernandez*, the *Thompson* court specifically held that "a defendant may be convicted by accountability of firearm offenses committed by someone he did not know was armed." *Id*.

Applying these principles, Seymour is accountable for the murder of Salazar. He knew and accepted that the code of the Latin Dragons required shooting at rival gang members. On the day of the shooting Seymour knew the gun was in the car and shared the aim of all occupants of the car to find and shoot a Latin King. Seymour understood his role to help identify Latin King targets and keep a watch for law enforcement. He remained present and participated in the group's search for a victim, and afterward

maintained his affiliation with Anaya and the other Dragons rather than report the crime. These circumstances support the conclusion that Seymour had an intent to facilitate the offense under the common design theory, and that he aided, abetted, or attempted to aid Anaya in shooting a victim believed to be a Latin King. Therefore, Seymour is directly responsible for the murder of Salazar and the cross reference from U.S.S.G. §2E1.1(a)(2) to §2A1.1(a) is applicable.

## CONCLUSION

Under both United States Sentencing Guidelines definitions of relevant conduct and the Illinois law of joint criminal accountability, and based on more than a preponderance of the evidence, I find that Keenan Seymour must be sentenced as responsible for the shooting death of Manuel Salazar.

**ACCORDINGLY:**

The Court's conclusion that for purposes of sentencing Keenan Seymour is accountable for the shooting death of Manuel Salazar is set forth in the opinion herewith.

The sentencing of Keenan Seymour is set for January 24, 2023 at 2:30 p.m. Hammond/Central time.

**SO ORDERED.**

ENTERED: January 11, 2023.

/s/ Philip P. Simon  
UNITED STATES DISTRICT JUDGE